5 Cal.Rptr.3d 512 (2003)
112 Cal.App.4th 937
Yoshi MOROHOSHI et al. Plaintiffs and Appellants,
v.
PACIFIC HOME et al. Defendants and Respondents.
No. B159594.
Court of Appeal, Second District, Division Seven.
October 22, 2003.
Review Granted January 22, 2004.
*513 Lange & Koncius, Joseph J.M. Lange, Los Angeles, and Jeffrey A. Koncius, for Plaintiffs and Appellants Yoshi Morohoshi and Hikaru John Morohoshi.
Giovanniello & Michels, Alexander F. Giovanniello Helen A. Michels, Anaheim, and Cristian L. Peirano, for Defendant and Respondent Harbor Regional Center.
JOHNSON, J.
Plaintiffs Yoshi and Hikaru Morohoshi appeal from the judgment following a special verdict finding defendant Harbor Regional Center was not negligent in the death of plaintiffs' son, Bobby Morohoshi, a developmentally disabled adult. Plaintiffs contend the trial court erred in refusing to allow the jury to find defendant vicariously liable for Bobby's death caused by the negligence of defendant's agent Pacific Home. We agree and modify the judgment accordingly.

FACTS AND PROCEEDINGS BELOW
This case was previously before us on the Morohoshis' appeal from a summary judgment in favor of defendant Harbor Regional Center (Harbor).[1] In an opinion *514 discussed more fully below we reversed the judgment, holding Harbor owed Bobby a mandatory, nondelegable duty to ensure he received adequate care and treatment at Pacific Home.[2]
Upon remand, the case went to trial against Pacific Home and Harbor on causes of action for negligence and abuse of a dependent adult.
The facts showed Harbor is a nonprofit community agency which, under contract with the state Department of Developmental Services, provides developmentally disabled individuals with access to services and support best suited to their needs.
Bobby Morohoshi was plaintiffs' adult developmentally disabled son. He suffered from severe diabetes. Harbor placed Bobby in Pacific Home in 1995 where he resided until his death in 1998.
Harbor arranged for nurses to visit Bobby twice a day to test his blood sugar and administer his insulin. Pacific Home's owner and her sister, who were registered nurses, originally performed this function. Later this function was performed by home health nurses and other members of Pacific Home's staff.
In 1998, Pacific Home hired new staff including Esther Sisson. Sisson was responsible for testing Bobby's blood sugar level the night before he died. She failed to do so. The next morning Bobby lay dead in his bedroom.
Prior to trial, the Morohoshis moved in limine for an order preventing Harbor from contending the fault for Bobby's death may or should be apportioned between Harbor and Pacific Home. They based their motion on their contention Harbor was vicariously liable for any negligence by Pacific Home in providing care to Bobby. The trial court denied the motion. Harbor moved in limine for an order prohibiting the Morohoshis from presenting any evidence or arguing Harbor could be held vicariously liable for Pacific Home's tortious conduct. The trial court granted this motion.
Later, in a discussion of the special verdict form the trial court repeated its view Harbor could not be held vicariously liable for Pacific Home's negligence and required the parties to draft a verdict form which would allow the jury to apportion negligence.
The jury found Pacific Home liable for Bobby's death on the basis of negligence and found it guilty of abuse of a dependent adult. The verdict awarded the Morohoshis economic damages of $5,644.36 and noneconomic damages in the amount of $600,000. The jury found Harbor not negligent and awarded no damages against it.
The Morohoshis filed a timely appeal.

DISCUSSION
Whether viewed from the perspective of law of the case or well-established common law principles, the trial court erred in ruling Harbor could not be held vicariously liable for the negligence of Pacific Home.
The law has long recognized one party may owe a duty to another which, for public policy reasons, cannot be delegated.[3] Such nondelegable duties derive from statutes, as we held in Morohoshi I, and from common law precedents as we discuss below.[4]

*515 I. HARBOR'S NONDELEGABLE DUTY DERIVES FROM STATUTES.

In Morohoshi I we recognized Harbor could be held liable for its own negligence toward Bobby[5] but we also specifically held Harbor was vicariously liable under the rationale of nondelegable duty for any negligence on the part of Pacific Home.[6]
As we explained in Morohoshi I, in enacting the Lanterman Act, the state of California accepted responsibility for developmentally disabled persons and established a system by which public and private entities provide services and supports to them.[7] Under the Lanterman Act, the Department of Developmental Disabilities ("DDS"), a public agency, is responsible for executing laws related to the care, custody, and treatment of individuals with developmental disabilities.[8] DDS contracts with private non-profit community agencies called regional centers to provide the developmentally disabled with "access to the services and supports best suited to them throughout their lifetime."[9] Harbor is one of these regional centers.
Article Two of the Lanterman Act establishes the regional centers' responsibilities to their consumers.[10] Regional centers are required to develop and implement an individualized program plan (IPP) for each consumer which specifies the consumer's needs for services and supports. These services and supports appear in statements of goals and also specific time-limited objectives in the IPP. Under the Act, both goals and objectives "shall be stated in terms that allow measurement of progress or monitoring of service delivery."[11] The IPP must be reviewed, re-evaluated, and modified no less than every three years by a planning team composed of regional center staff, the consumer, and where appropriate, the consumer's parents, to ascertain whether the planned services have been provided and the objectives have been fulfilled within the time specified in the IPP.[12]
The Lanterman Act is replete with language establishing this duty is mandatory, not discretionary, and non-delegable.
For example, section 4648 states in pertinent part; "In order to achieve the stated objectives of a consumer's individualized program plan, the regional center shall conduct activities including, but not limited to all of the following: (a) Securing needed services and supports ... (1) It is the intent of the legislature that services and supports assist individuals with developmental disabilities in achieving the greatest self-sufficiency possible and in exercising personal choices. The regional center shall secure services and supports that meet the needs of the consumer, as determined by the consumer's individual program plan. (2) ... Services and supports shall be flexible and individually tailored to the consumer ... (3) A regional center may, pursuant to vendorization or a *516 contract, purchase services or supports for a consumer ... which the regional center ... determines will best accomplish all or any part of that consumer's program plan." (Italics added.)
Subdivision (a)(3)(A) of section 4648 defines "vendorization" as "the process for identification, selection, and utilization of service vendors or contractors, based on the qualifications and other requirements necessary to provide the service."
Section 4648, subdivision (a)(6), provides: "The regional center and the consumer ... shall, pursuant to the individual program plan, consider all of the following when selecting a provider of consumer services and supports: (A) A provider's ability to deliver quality services or supports which can accomplish all or part of the consumer's individual program plan. (B) A provider's success in achieving the objectives set forth in the individual program plan. (C) Where appropriate, the existence of licensing, accreditation, or professional certification." (Italics added.)
If a regional center chooses to go the "vendorization" route, its duties do not end upon the selection of a vendor. To the contrary, section 4648, subdivision (a)(7) states: "No service or support provided by any agency or individual shall be continued unless the consumer ... is satisfied and the regional center and the consumer ... agree that planned services have been provided, and reasonable progress toward objectives have been made." (Italics added.)
Section 4648, subdivision (d) provides: "In order to increase the quality of community services and protect consumers, the regional center shall, when appropriate, take either of the following actions:
(1) Identify services and supports that are ineffective or of poor quality and provide or secure consultation, training, or technical assistance services for any agency or individual provider to assist that agency or individual provider in upgrading the quality of services or supports." (Italics added.)
Finally, section 4742 provides "The regional center or its designated representative shall (a) guide and counsel facility staff regarding the care and services required by each client served by the regional center; and (b) monitor the care and services provided the individual to assure that care and services are provided in accordance with the individual program plan." (Italics added.)
On its face, the Lanterman Act clearly imposes mandatory duties on Harbor to ensure the consumer receives proper care and services, whether or not Harbor chooses to "vendorize" the actual placement.[13] In Cole v. Antelope Valley Union High School District the court held it is presumed when the Legislature uses both "shall" and "may" it attached to them their ordinary meaning, and under ordinary meaning, "shall" means the requirement imposed is mandatory.[14] Although section 4648, subdivision (a)(3), allows Harbor to use discretion in determining whether to pursue "vendorization," the use of the word "may" in this subdivision does not render discretionary the duties imposed by the rest of section 4648, and the rest of the Lanterman Act. Section 4648, subdivisions (a) and (d) imposed on Harbor mandatory duties to secure services and supports and protect Bobby from receiving poor quality services. Section 4648, subdivision *517 (a)(3) merely authorized Harbor to have some discretion in determining which service providers, not what services, would best effectuate this goal.
The Legislature's use of the word "shall" in the Lanterman Act means "must." Accordingly, Harbor had a broad duty under sections 4648, subdivision (a) and 4742, subdivision (a) to secure Bobby's needed services and then guide and counsel Pacific Home's staff about Bobby's care. It also had a broad duty to monitor the care Bobby received, pursuant to section 4742, subdivision (b). Thus, Harbor was not absolved of responsibility for Bobby's care and treatment when it contracted with Pacific Home to provide such care and treatment.
Under the statute Harbor is not merely required to present options to its consumers, it is required to "assure that care and services are provided in accordance with the individual program plan."[15]
Thus, under the Lanterman Act Harbor had a mandatory duty to ensure Bobby received appropriate supports and services and to monitor those supports and services.
In our previous opinion we stated we did not agree with Harbor's contention its duty under section 4648, subdivision (a)(3) was essentially a duty to investigate, which may not be read as imposing a mandatory duty to prevent Bobby from coming to harm. We did agree Harbor had discretion to select which service providers would best meet Bobby's IPP goals. However, we concluded, Harbor had a mandatory, not discretionary, duty to reassess those services and Bobby's IPP and to correct any substandard services or supports. Under section 4742, subdivision (b), Harbor was required to monitor Bobby's services.[16] Title 17, Subchapter 4.2, Article 2, section 56103(a) of the California Code of Regulations required Harbor to meet with Bobby at least quarterly to review his IPP progress.
We also rejected Harbor's contention it was merely a broker between Bobby and Pacific Home. Sections 4648, subdivision (a) and 4742, subdivision (a) imposed broader duties on Harbor than those of a mere broker of services.[17]
In the previous appeal Harbor contended DDS regulations limit regional center oversight of vendors to one monitoring visit to the caregiver's facility each year.[18] We found, to the contrary, the regulations support the imposition of a mandatory duty in this case. Section 56048, subdivision (d)(1) of the regulations requires at least one monitoring visit each year. And as discussed above, section 4742, subdivision (b) of the Lanterman Act also imposed on Harbor a broad duty to monitor Pacific Home to ensure compliance with Bobby's IPP requirements and health *518 goals, and to correct any deficiencies in the services provided by Pacific Home.
Section 56048, subdivision (d)(1) of the DDS regulations provides the regional center, through its designated facility liaison, "shall complete a minimum of one monitoring visit, which may be unannounced ... to each facility each year."[19] This is consistent with section 4742, subdivision (b) of the Lanterman Act itself, which states: "The regional center shall ... monitor the care and services and supports provided the individual to ensure that care and services are provided in accordance with the individual program plan." The regulations therefore support the imposition of a mandatory duty of care on Harbor.
Finally, in Morohoshi I, Harbor contended it did not have a nondelegable duty to Bobby because the statutory scheme does not envision it. Harbor relied on Privette v. Superior Court;[20] however, Privette contains no such holding.[21]
For the reasons explained above, we held in Morohoshi I that as a matter of law Harbor's duties could not be delegated to Pacific Home.
Under the law of the case doctrine, when an appellate court states a principle or rule of law necessary to its decision "that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal[.]"[22] Our holding in Morohoshi Ithat Harbor owed a nondelegable duty of care to Bobbywas necessary to our decision because in granting Harbor's motion for summary judgment the trial court found Harbor "owed no duty to take steps which would have prevented the death of [the plaintiffs'] adult son...."[23] Furthermore, the question whether Harbor owed a nondelegable duty of care to Bobby was relevant to the litigation, put in issue by both parties, and therefore necessary to decide.[24]
The trial court's failure to adhere to our holding on Harbor's nondelegable duty of care was error. The error prejudiced plaintiffs because the jury found Pacific Home negligent in causing the death of Bobby Morohoshi thereby making Harbor vicariously liable as a matter of law.[25]

II. HARBOR'S NONDELEGABLE DUTY DERIVES FROM WELL-ESTABLISHED COMMON LAW PRINCIPLES.

In addition to the statutory ground, and independent of it, common law tort principles support the conclusion Harbor had a nondelegable duty to ensure Bobby received adequate care and treatment at Pacific Home.
Developmentally disabled persons are a particularly vulnerable population as the Legislature recognized in enacting laws *519 specially protecting them from abuse.[26] When an agency or entity undertakes to provide services for the developmentally disabled, it stands in a special relationship with them in respect to the provision of those services. The situation is analogous to cases where liability for failure to warn or exercise special protective measures is premised on a particular relationship between the plaintiff and defendant causing dependence of the plaintiff on defendant and raising a corresponding quasi-fiduciary obligation.[27] Courts in other states have held a special relationship exists between the developmentally disabled and the agency charged with their care and protection.[28] We agree with those decisions.
Special relationships may, for public policy reasons, give rise to nondelegable duties. Nondelegable duties function as an assurance "that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor."[29] The recognition of nondelegable duties tends to insure "there will be a financially responsible defendant available to compensate for the negligent harms caused by that defendant's activity[.]"[30]
The factors which support imposing a nondelegable duty on Harbor include society's need to protect a vulnerable class of persons who are unable to care for or protect themselves,[31] its voluntary acceptance of the duties described above and its assurances to its clients and their families it will safeguard and defend its clients' rights.[32] Thus, imposing a nondelegable duty on Harbor is consistent with the well recognized common-law rule set forth in the Restatement of Torts: "A master or other principal who is under a duty to provide protection for or to have care used to protect others ... and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty."[33]
Accordingly, Harbor is vicariously liable to the Morohoshis for Pacific Home's negligence pursuant to its nondelegable duty of care to Bobby.

*520 DISPOSITION
The judgment is modified to provide Harbor Regional Center and Pacific Home are jointly and severally liable to the Morohoshis for the economic and noneconomic damages sustained as a result of Pacific Home's negligence in the sum of $505,644.36 plus costs as provided by law. In all other respects the judgment is affirmed. Appellants are awarded their costs on appeal.
We concur: PERLUSS, P.J, and WOODS, J.
NOTES
[1] Morohoshi v. Pacific Home (Aug. 21, 2001, B143379) [nonpublished opinion]; hereafter Morohoshi I.
[2] Morohoshi I, supra, at pages 9-10.
[3] Barry v. Raskov (1991) 232 Cal.App.3d 447, 455, 283 Cal.Rptr. 463.
[4] See discussion at pages 518-520, post.
[5] Morohoshi I, supra, at pages 10-15.
[6] Morohoshi I, supra, at page 17. The nondelegable duty rule is a form of vicarious liability. (Maloney v. Rath (1968) 69 Cal.2d 442, 446, 71 Cal.Rptr. 897, 445 P.2d 513; Srithong v. Total Investment Co. (1994) 23 Cal.App.4th 721, 727, 28 Cal.Rptr.2d 672.)
[7] Welfare and Institutions Code section 4501. All future statutory references are to the Welfare and Institutions Code.
[8] Section 4416.
[9] Section 4620.
[10] Sections 4640-4659.
[11] Section 4646.5, subdivision (a)(2).
[12] Section 4646.5, subdivision (b).
[13] See Daniels v. Tergeson (1989) 211 Cal. App.3d 1204, 1207, 259 Cal.Rptr. 879 (use of the word "shall" imposes mandatory duty).
[14] Cole v. Antelope Valley Union High School District (1996) 47 Cal.App.4th 1505, 1513, 55 Cal.Rptr.2d 443.
[15] Section 4742, subdivision (b). (Italics added.)
[16] Section 4742, subdivision (b) required Harbor to monitor the care, services, and supports Pacific Home provided to Bobby to ensure they were in accordance with his IPP.
[17] Section 4648, subdivision (a) provides in relevant part: "In order to achieve the stated objectives of a consumer's individualized program plan, the regional center shall conduct activities . . . including, but not limited to . . . (a) Securing needed services and supports. (1) ... The regional center shall secure services and supports that meet the needs of the consumer, as determined by the consumer's individual program plan." Section 4742, subdivision (a) states: "The regional center . . . shall (a) guide and counsel facility staff regarding the care and services and supports required by each consumer served by the regional center." (Italics added.)
[18] California Code of Regulations, title 17, section 56048, subdivision (d)(1).
[19] California Code of Regulations, title 17, section 56048, subdivision (d)(1). (Italics added.)
[20] Privette v. Superior Court (1993) 5 Cal.4th 689, 21 Cal.Rptr.2d 72, 854 P.2d 721.
[21] In Privette, the Supreme Court ruled the peculiar risk doctrine affords no basis for the employee of an independent contractor to seek tort recovery from the person who hired the contractor if there is worker's compensation coverage.
[22] People v. Stanley (1995) 10 Cal.4th 764, 786, 42 Cal.Rptr.2d 543, 897 P.2d 481; internal quotation marks and citation omitted; Palmer v. Regents of University (2003) 107 Cal.App.4th 899, 910, 132 Cal.Rptr.2d 567.
[23] Morohoshi I, supra, at page 2.
[24] Morohoshi I, supra, at page 17.
[25] Morohoshi I, supra, at page 17.
[26] Sections 15600, et sequitur and see footnote 32, post.
[27] See for example Tarasoff v. Regents of University of California (1976) 17 Cal.3d 425, 436, 131 Cal.Rptr. 14, 551 P.2d 334; Johnson v. State of California (1968) 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352; Ellis v. DAngelo (1953) 116 Cal.App.2d 310, 253 P.2d 675.
[28] See for example Hinckley v. Palm Beach County Bd. (Fla.App.2001) 801 So.2d 193, 195-196; Stropes v. Heritage House Childrens Ctr. (Ind.1989) 547 N.E.2d 244, 254.
[29] Maloney v. Rath, supra, 69 Cal.2d at page 446, 71 Cal.Rptr. 897, 445 P.2d 513.
[30] Maloney v. Rath, supra, 69 Cal.2d at page 446, 71 Cal.Rptr. 897, 445 P.2d 513.
[31] In enacting the Elder Abuse and Dependent Adult Civil Protection Act, sections 15600, et sequitur, the Legislature found a "significant number" of dependent adults "have developmental disabilities and that mental and verbal limitations often leave them vulnerable to abuse and incapable of asking for help and protection." Section 15600, subdivision (c). The Legislature further found most "dependent adults who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and other poor health that place them in a dependent and vulnerable position." Section 15600, subdivision (d).
[32] See discussion at pages 516-517, ante.
[33] Restatement of Torts, Second (1965) section 214, page 463.